## Nancy L. Waters

From: Holly Williams [holly@williamslawpc.com]
Sent: Monday, May 16, 2011 7:07 PM
To: Nancy L. Waters
Cc: whlemons@satexlaw.com
Subject: Consulting Expert Report

Nancy:

Attached is a preliminary report of a consulting expert that we have retained.  The report is being produced for settlement purposes only at this time.  If the case does not settle, we will file a motion to late designate on the basis that the need for the expert was not apparent and materials were not available for her review until discovery was obtained.

Thanks,

Holly


[cid:204010300@17052011-0144]


Holly B. Williams

Williams Law Firm, P.C.

1209 W. Texas Ave.

Midland, TX 79701

(432) 682-7800

(432) 682-1112 Fax



PERSONAL AND CONFIDENTIAL:  This message originated from Williams Law Firm, P.C.  This message and any files or attachments transmitted with it are confidential, intended only for the named recipient, and may contain information that is subject to the attorney-client privilege, protected by the attorney work product doctrine, and/or otherwise protected from unauthorized disclosure.  If you receive this message in error, please advise the sender by immediate reply and delete the original message.  Thank you.



1

APP1



*Employment
Practices Group*

*Defining employers' rights in the workplace*

*By Electronic and U.S. Mail*

May 16, 2011

Holly B. Williams
Williams Law Firm, P.C.
1209 W. Texas Avenue
Midland, Texas 70701

Re: *Karla Grimes v. Wal-Mart Stores Texas, LLC*
*Civil Action No. 7:10-CV-00067*
*United States District Court for the Western District of Texas, Midland-Odessa Division*

Dear Ms. Williams:

Williams Law Firm, P.C. retained me to examine file materials and offer expert opinion testimony in connection with Karla Grimes's lawsuit against Wal-Mart Stores Texas, LLC ("Wal-Mart" or the "Company") alleging, among other things, gender discrimination, disability discrimination, and retaliation arising out of her February 12, 2009 termination from employment.

Issues addressed here include the Company's policies, procedures and practices relating to hiring (also known as career preference), job coding, internal investigations into alleged misconduct, performance management (also known as coaching for success or coaching for improvement), and terminations and the adverse action and termination of Karla Grimes as a result. This report is a summary of the expert opinion testimony I am offering in this matter. As discovery is still ongoing, this report is preliminary in nature, and I reserve the right to and expect to supplement this report at the conclusion of discovery.

In the field of Human Resources and employment law, certain accepted industry standards are recognized in law or as "reasonable" or "best practices" for the handling of employer-employee issues in all aspects of Human Resources, including hiring, training, maintaining and enforcing policies, managing employees, responding to complaints of discrimination and retaliation, conducting internal investigations, and making termination decisions. Sources relied on to form opinions about action employers should take when faced with such issues include the following: guidance and model policies promulgated by governmental agencies such as the Equal Employment Opportunity Commission ("EEOC") and state fair employment practices agencies; court decisions; legal analyses published in legal journals and discussed at continuing legal

1

APP2

education courses and programs; books and treatises; and the sharing of practical approaches and strategies at professional conferences and continuing education courses for human resources professionals and employment attorneys.

Professional organizations, as well, are a source for establishing and communicating the industry standard. For example, The Society for Human Resources Management ("SHRM"), the world's largest professional association devoted to human resource management and an organization of which I am a member, is a key authority relied upon in articulating industry "best practices" for the handling of employer-employee issues in all aspects of human resources as well. Another noted authority relied upon for the articulation of such "best practices" is Business and Legal Resources ("BLR"), an acknowledged authority providing updated coverage of state and federal laws and industry standards on a variety of workplace matters.[1] BLR's business and legal resources are prepared by lawyers and industry experts for the business world so that organizations can have access to appropriate tools and resources for compliance. The California Association of Workplace Investigators ("CAOWI") is a professional organization designed to promote and enhance workplace investigations, and is a resource for the proper conduct of investigations.[2]

My evaluation of the Company's actions is based on whether Wal-Mart followed its own policies and industry standards with respect to these practices, as articulated in the sources described above and throughout this report, have been adhered to and followed. Wherever possible, I rely on Wal-Mart's version of the facts, as I am not making any credibility determinations.

## I.   *SUMMARY OF OPINIONS*

In this report, I outline my opinions as follows:

1.   Wal-Mart failed to abide by sound employment practices or its own policies in connection with the investigation into alleged misconduct and the decision to demote and give a decision-making day to Karla.

2.   Wal-Mart failed to abide by sound employment practices or its own policies in connection with the termination of Karla.

3.   Wal-Mart field to abide by sound employment practices or its own policies when it failed to investigate Karla's complaint that the adverse employment action may be discriminatory or in retaliation for her declining a promotion based on issues surrounding her disabled son.

---

[1] I recently spoke at BLR's National Employment Law Update in November 2010, in Las Vegas, Nevada, and I have been quoted in BLR publications.

[2] I will be a speaker at CAOWI's second annual conference, which will be held in Glendale, California in November 2011.

## II.   *BACKGROUND FACTS*

### A.   *Karla's Employment History*

Karla Grimes was hired by Wal-Mart on September 16, 1986. She held several positions over the years, resulting from promotions, which included the following: Cashier, Receiving Associate, Department Manager, Front End Manager, Support Manager, Assistant Manager, Co-Manager, Store Manager of Store #513, and Store Manager of Store #3645 located in South Midland, a position she held since June 11, 2005.

Karla has an 11-year-old son, who was born on November 10, 1999. He suffers from a brain injury (PVL) and cerebral palsy. As such, he is a person with a disability.

As Store Manager, Karla was in charge of her store. Below her were two Co-Managers, Olga Guebara and Daniel Henson. Under them were eight (8) or nine (9) Assistant Managers. (Brown Depo., p. 41) Patricia Rosa was the Personnel Manager within the store, and she reported to Karla with a dotted line to Marcello Brown, the Market Human Resources Manager. (Brown Depo., pp. 43, 46)

Other key players include the following: Roy Adams, Market Manager, who was Karla's direct supervisor. Marcello Brown from HR was responsible for approximately ten (10) to thirteen (13) stores. (Brown Depo., p. 26) Marcello reports to Keitha Keene, the Regional Human Resources Director.

On November 18, 2008, Karla was offered a new position (a promotion), to be Market Manager for Market 95. She would need to relocate from her home in Odessa, Texas to New Mexico, about 200 miles away, to accept the job. After researching schools for her disabled son, she realized that the school system in New Mexico was inadequate for her son's special needs and, for this reason, declined the position shortly after receiving the job offer. She told Wal-Mart the true reason why she could not accept the job. Keitha Keene, the Regional Human Resources Director, was one of the persons who interviewed Karla. (Grimes Depo., p. 50)

Two months later, Karla was disciplined, demoted, and then terminated from the job, on February 12, 2009.

### B.   *Adverse Employment Action Arising Out of Career Preference*

As explained more fully below, Karla was given a so-called "Decision-Making Day" ("D-Day") and a demotion on February 3, 2009 for failing to uphold the integrity of the career preference process.

Several policies are in place about career preference. At the unemployment hearing before the Appeals Tribunal of the Texas Workforce Commission on June 9, 2009, the Market Human Resources Manager, Marcello Brown, explained the process as follows:

> It is a system that was put in place by Wal-Mart three and a half years ago to allow...it is like a job posting system. We can post jobs in the system and it gives associates the opportunity to actually opt into and tell management they want to be interviewed if they are interested in it." The process allows for external applicants as well. It was instituted because, "In years past we have had a lot of problems with being accused of not choosing people for jobs fairly or being consistent and fair about it and there were a lot of lawsuits that came because of it, so they instituted a system to more or less as a check and balances to make sure that anyone who was actually interested in a job had an opportunity to post for it and to be interviewed."

(Transcript Bates PL – 000287)

Nowhere in his description of Career Preference did Marcello talk about job codes or explain how job coding had any connection to posting and interviewing for jobs.

C. _Termination Due to Integrity Issues with and Circumvention of Career Preference_

Karla was terminated on February 12, 2009. On the Exit Interview form dated 2/12/09, in the section requesting "Detailed Statement of Termination," Roy Adams wrote, "Integrity issues involving career preference and circumvention of career preference." (Exhibit 34) In this lawsuit, Wal-Mart takes the position that Karla was terminated for job coding violations, which appears to be distinct from the Career Preference issues that led to the D-Day and demotion.

I was not provided with any Wal-Mart policy relating to job coding.

Wal-Mart, at times, says that job coding is part of the Career Preference policies or guides, but I see no mention of job coding in the policies that I reviewed relating to Career Preference. Specifically, the Career Preference policies that I reviewed include Career Preference Guide CPG 1206 and 1208, Hiring Process CPG 1202, Hiring Process CPG 1211, Hiring Process CPG 1203, and Hiring Process CPG 1201, make no mention whatsoever of job coding. (Exhibits 37, 38, 39, 42, 67, 94)

According to Marcello Brown, a Co-Manager or Store Manager assigns job codes, subject to review by Human Resources. (Brown Depo., p. 46) In Karla's job description, however, nowhere does it say that she is responsible for job coding. (Exhibit 58) Indeed, the job description does not even say that Karla is responsible for hiring or the Career Preference process. Rather, she is responsible for Operations; Merchandising; People; and Bakery, Produce, Meat & Deli, Dry Grocery. With regard to People responsibilities, Karla is expected to conduct investigations, approve terminations, and evaluate Management's performance and provide disciplinary action to salaried managers, as needed.

The Personnel Manager for Karla's store was Patricia Rose, and she is the person who is responsible for job coding and auditing job codes by going through individual personnel files.

4

(Brown Depo., p. 172; Adams Depo., p. 118)    Marcello admitted that he never trained Patricia on job coding, but it was part of her job responsibility. (Brown Depo., p. 45)

At the time of Karla's termination, there was a "new store" and an "old store" structure. The store that Karla managed was in the new store structure. (Brown Depo, p. 35) Patricia Rose, Personnel Manager, acknowledged that it "was hard getting familiar with new job codes that come with the new store structure, but I did..." (Exhibit 64)

Once established, job codes are reviewed in a number of ways. Audits are done by the Personnel Manager in January or February of each year. (Adams Depo., p. 118) Informal audits are also done while HR visits stores. (Brown Depo., p. 70) No formal process exists to review job codes. (Brown Depo., p. 70) With respect to Karla's store, Keitha Keene did an HR review of the store in the fall of 2008, just months before Karla's termination. (Brown Depo., p. 71) Marcello Brown was involved as well, as part of a regional visit. (Brown Depo., p. 71) Job codes was not an area of concern; the only concern noted was understaffing.

I reviewed conflicting testimony on the issue of whether job codes are part of Career Preference. Compare the following:

### Testimony/Evidence Saying that Job Coding Is Part of Career Preference

- Marcello Brown said that job codes are part of career preference. (Brown Depo., p. 92) When asked to explain, he stated, "Because job codes – you have to go through Career Preference for the job codes. And remember everything is done through Career Preference." (Brown Depo., pp. 156-57)

- In connection with an employee being terminated for career preference issues, Roy Adams said that "sometimes could do with job codes." (Adams Depo., p. 123)

- Roy Adams also vaguely tied career preference and job coding together in this portion of his deposition testimony when he was asked for the reason for Karla's termination: "And specifically relating to career preference, right?" He responded: "I was the – final determination was job code and pay code issue. Some of that comes about when you don't do career preference, correct" (Brown Depo., p. 154)

### Testimony/Evidence Supporting the Fact that Job Coding Is Distinct from Career Preference

- Roy Adams clearly talked about a distinction between career preference and job coding at his deposition:

> Q:    If you had – if the career preference interview situation was not part of the decision to terminate her, why did you walk her through her statement on February 12[th]?

5

A:    Probably more of a way that is the next succession of what happened because she was about to get terminated. ***You had the career preference issues in your store, <u>and now</u> you have job code and pay code issues.***

(Adams Depo., p. 158) (Emphasis added)

- In the call notes for the wage and hour "pay discrepancy issue" that was initiated on February 10, 2009, Market Human Resources Manager identified three (3) issues where associates were not in the correct job and not getting the correct pay. It was further noted in the document that the Store Manager "was recently removed due to issues with career preference being ignored." Here, the job coding issues were *not* referred to as further career preference issues. Rather, the notes describe the issues as "wage & hour" and "pay discrepancies."

The D-Day, demotion and termination also had an "integrity" component to them. In Wal-Mart's Statement of Ethics (Exhibit 33), the Company talks about "Leading with Integrity in Our Marketplace." (page 19) It mentions fair competition and intentional dishonesty. It states, "Striving for excellence means operating our business with high integrity, and avoiding deceptive, dishonest, or fraudulent activities." Thus, it appears that Wal-Mart defines integrity as involving an intent to deceive, be dishonest, or be fraudulent. It is more than just a performance issue or engaging in misconduct.

III.    ***<u>OPINION #1: WAL-MART FAILED TO ABIDE BY SOUND EMPLOYMENT PRACTICES OR ITS OWN POLICIES IN CONNECTION WITH THE INVESTIGATION INTO ALLEGED MISCONDUCT AND THE DECISION TO DEMOTE AND GIVE A DECISION-MAKING DAY TO KARLA</u>***

A.    *Factual Background*

Before Wal-Mart disciplines or coaches an employee, Wal-Mart policies and industry standards dictate that the alleged misconduct be carefully and thoroughly investigated. Factual conclusions must be reached after conducting the necessary interviews and reviewing the relevant documentation. Credibility determinations must be made, where conflicting evidence exists. Here, Wal-Mart failed to follow its own policies or industry standards in this regard, to Karla Grimes's detriment.

Decision-Making Day, as outlined in Wal-Mart's Coaching for Improvement Policy (PD-30), is part of Level Three coaching. (Exhibit 28) It "must …be formally documented," and Wal-Mart should "clearly explain the deficiencies." Further, the employee is expected to complete a detailed action plan. When Wal-Mart meets with the employee at the start of her next scheduled workday, together, the detailed action plan should be reviewed. This Plan then gets inputted into the Coaching for Improvement System.

Roy Adams's notes dated February 3, 2009 confirm that Karla received a "D-day w/ demotion." (Exhibit 75) Karla was demoted and given a D-Day because she told Co-Manager Olga Guebara

to falsify the interviews. (Brown Depo., p. 109; Adams Depo., pp. 29-30) According to Wal-Mart policy, demotion may be included with the Decision-Making Day. Demotions should "always be accompanied by appropriate documentation."

No formal written documentation exists, however, of the demotion or D-Day for Karla. (Adams Depo., p. 79)

Additionally, contrary to policy, neither Karla nor Olga submitted a written plan. (Adams Depo., p. 77)

With regard to the alleged misconduct at issue, Olga Guebara said that Karla directed her to use old interview forms and not to conduct additional interviews of candidates to fill an open position, which is what Marcello Brown told her to do. Karla repeatedly denied this, and said she did nothing wrong. That is, Karla denied that she told Olga to use prior interview sheets; rather, she says that she directed her to interview two more candidates, consistent with what Marcello told Olga. She explicitly said so in her February 2, 2009 "Statement of Facts." (Exhibit 80) In another statement that Karla prepared and emailed to the Company on February 6, 2009, similarly, she wrote, "I told Marcello that Olga and I had discussed the names to be interviewed but was unaware that Olga did not conduct the interviews and I did not know that she had sent in interview sheets.... Marcello then asked if I instructed Olga to send in old interview sheets and I stated no I did not.... I did not give the direction to send in old interview sheets... I had never instructed her to turn in interview sheets we had only discussed who to interview." (Exhibit 67) She prepared this detailed statement of her version of her events, after talking to Keitha Keene and at her request. (Grimes Depo., p. 125)

In addition to Karla's notes, Wal-Mart officials also recorded Karla's denials in contemporaneous documentation that was created. For example, Roy Adams memorialized this in his notes dated February 2, 2009 where he wrote "Olga did not ask her to use [old interview sheets]" and "most definitely did not tell her." (Roy Depo, p. 84; Exhibit 74) Becky Thomas, similarly, wrote in her February 6, 2009 notes, "[Karla] continually stated that it never happened, she did not tell Olga to use that interviews that she would never do that. She stated that if Marcello told [Olga] to interview two more Associates than (sic) [she] need[ed] to do it." (Exhibit 78)

This is consistent with a situation that Personnel Manager Patricia Rose was involved in, wherein she approached Karla and told her that something that Olga did not fit (about offering a part-time associate a full-time position with closed availability). Karla responded by talking with Olga and telling her that "she couldn't do that." (Exhibit 64)

What originally was a "she said/she said," with Karla and Olga having different positions on the topic, quickly changed, as an objective, third-party witness had knowledge of the situation. That is, it came to Wal-Mart's attention that Asset Protection Coordinator, Christy Rodriguez, was present during a conversation between Karla and Olga where they discussed conducting additional interviews. Christy confirmed what Karla said and provided a written statement saying so on February 10th at 4:51 p.m., two days before the termination.

Indeed, it is undisputed that Wal-Mart knew that Christy's statement corroborated what Karla said about directing Olga to conduct the interviews, in accordance Marcello Brown's instruction. Roy Adams, for example, testified that Christy said that she heard Karla tell Olga to conduct the interviews. (Adams Depo., p. 83) Marcello admitted that the statement from Christy -- "an independent third-party witness" -- supported Karla's contention that she told Olga to get the interviews done. (Brown Depo., pp. 146, 149) Indeed, Christy wrote in her statement, "Karla told Olga to ensure that the interviews got done." (Exhibit 63)

Yet, despite this fact, and while Marcello did admit that it was a "key fact," the facts that Christy provided on this topic were ignored. Marcello failed to include these facts in the Executive Summary that he prepared of the events leading up to the demotion and termination decision. (Brown Depo., p. 150)   When asked if it was "significant" that Christy said that she overheard Karla tell Olga to do the interview, Marcello responded, "I think it is sig – significant, but what exactly did that – did that mean?  I have no idea."[3]  (Brown Depo., p. 149)

While Olga was the *only* person who claimed that Karla knew that she was not conducting additional interviews but was using old forms instead, Roy Adams stated that Karla was "implicated & [it was] confirmed thru (sic) multiple sources that [she] knew Olga was using old interviews." (Exhibit 90) That is patently false. At his deposition, Roy could not identify any sources for this information other than Olga and Christy, but Christy did not corroborate this point.

B.     *Industry Standards and Wal-Mart Policies*

When disciplining (and terminating) employees, employers should do so by ensuring that they are not violating the law, are acting consistently with industry standards, and are following their internal policies and procedures.

First, in meting out discipline, including demotions and up to and including termination, employers should always consider whether or not the adverse employment action might be for an unlawful reason or might be for an unlawful reason. Those reasons include an employee being a member of a protected category, engaging in protected activity, involved in a public policy act, and the like.  Employers should double check to ensure that the adverse action was for the proper reason.

For example, employers should consider the race, color, religion, sex, national origin, age, physical disability, mental disability, veteran status, pregnancy status, and genetic information (and any other protected characteristic under state and local law) of an employee before making the demotion decision.  Associated with someone with a disability is included in this listing as well.  The employer should ensure that the adverse action decision was not made *because of* or be motivated by the employee's protected category, such as having a close relationship with

---

[3] At another point in his testimony, Marcello stated that he was unclear what Christy was saying or meant in connection with Karla's knowledge of the interviews.  If he was unclear, he should have contacted Christy for clarification.

APP9

someone with a disability. In addition, the employer should ensure that employees in other protected categories were treated similarly.

Also, the employer should examine whether or not the employee had recently engaged in any protected activity, to ensure that the adverse action was not retaliatory in nature. Examples of protected activity include an employee taking maternity or paternity leave, being out on FMLA leave, sustaining a work-related injury and receiving worker's compensation benefits, serving on a jury, requesting or receiving an accommodation under the Americans with Disabilities Act ("ADA"), being a whistle-blower, engaging in certain union-related activities, lodging an internal harassment, discrimination, or retaliation complaint, and the like.

Public policy implications should also be considered. An employer should assess whether the employee is being terminated for engaging in an act that public policy would encourage or if the employee being terminated for refusing to do an act that public policy would condemn. An employer should examine whether any public policy issues are in play before taking adverse employment action.

Finally, any employment agreements or employee handbooks should be reviewed. If an employment agreement addresses the terms under which an employee can be terminated, the employer should certainly follow the terms of that contract, so long as it is binding and legally enforceable. In addition, some employers have employee handbooks which govern how demotions are to be conducted and under what circumstances. Some employee handbooks can rise to the level of a contractual obligation and, when that is the case, it must be followed. Even if not a contract, an employee handbook should be followed, as it presumably sets forth the internal rules by which the company intends to operate.

Once an employer is satisfied that the contemplated adverse employment action does not create legal risk, after examining federal law, state law, and common law as articulated above (in brief), the employer should also consider whether it has followed best practices or industry standards before taking action against an employee.

As SHRM makes clear in its March 2010 article entitled "Expert Provides Guidance on Investigation Dilemmas," best practices dictate that an employer promptly investigate instances of alleged misconduct before making a decision as to whether disciplinary action against the employee is appropriate. The article emphasizes that "Courts give us some guidance on what needs to be investigated... such as allegations of harassment, discrimination, theft, substance abuse, violence, Internet/e-mail usage, *insubordination, ethics* and financial issues," noting that this is not an all-encompassing list. (Emphasis added).

In addition to adhering to industry standards, the Company must look internally at its written policies and procedures. Among other policies, Wal-Mart maintains a corporate policy entitled "Coaching for Improvement," Policy PD-30. In the section entitled "Coaching for Improvement Process," Wal-Mart emphasizes that:

> Investigations are a routine part of the coaching process. It ensures a
> complete review of the facts and allows time for proper consideration of

appropriate disciplinary action. During the investigation, the Associate may be suspended without pay if it is in the best interest of all parties involved.

Salaried Members of Management suspended without pay must receive their salary through the end of their current pay week.

Refer to the Investigation and Suspension Policy (PD-57) for additional information.

Wal-Mart's Corporate Policy entitled "Investigations/Suspension Policy," reiterates the Company's obligation to investigate alleged policy violations:

When it is necessary to conduct an investigation regarding possible violations of Wal-Mart policies, the investigation should be handled promptly and thoroughly. The investigation will be focused on determining if the allegations can be substantiated and what action, if any, is necessary....

NOTE. This policy is used for all investigations, except for fraud or theft issues....

The policy goes on to articulate its internal procedure for investigating alleged Wal-Mart policy violations:

All investigations should be conducted thoroughly and promptly. Objectives of an investigation are to:

• determine whether the allegations can be substantiated;
• determine whether the allegations, if substantiated, constitute a violation of company policy;
• determine what action, if any, is needed;
• maintain confidentiality.

Here, Wal-Mart failed to thoroughly investigate the issues involving Karla's direction to Olga by failing to consider the statement of Christy Rodriguez and not explaining why Karla was not to be believed. Repeatedly, Wal-Mart made incorrect factual assertions, which led to the wrong conclusion. It failed to act reasonably and consistently with industry standards and its own policies in investigating this issue.

IV.    **_OPINION #2: WAL-MART FAILED TO ABIDE BY SOUND EMPLOYMENT_**
       **_PRACTICES OR ITS OWN POLICIES IN CONNECTION WITH THE_**
       **_TERMINATION OF KARLA_**

   A.    _Factual Background_

Before terminating an employee, an employer must carefully and thoroughly investigate, as
detailed in the preceding section. Once it does, it should make a termination decision consistent
with the factual conclusions. Its documentation should then clearly and unambiguously state the
**_true reason_** for termination. That reason should not change or shift; it should be consistent.

Here, it is most unclear whether Karla was terminated for the interviewing/career preference
issue, the job coding issue, or a combination. This is problematic.

In this lawsuit, the Company takes that position that Karla was terminated "based off of job code
issues that were discovered, discrepancies that were found within the store." It states that the
termination had nothing to do with the interview sheets that had led to Karla's demotion and D-
Day. (Brown Depo., p. 67)

Marcello Brown was the "Investigating Manager" and involved in the termination decision.
(Brown Depo., p. 36) He testified that, following the decision to give Karla a D-Day, he learned
of about new information that came to light. He said that an associate named Rosa claimed in an
"Open Door" process that she was not being paid properly. (Brown Depo, pp. 110-11) Rosa
was doing training at one store (Store #537) but she was to work at Karla's store after she
completed the training. (Brown Depo., pp 110-12) Marcello considered this to be a wage and
hour investigation.

As part of his investigation, then, Marcello interviewed Olga Guebara. (Brown Depo., pp. 113-
14, 124) Olga explained to him that Rosa was supposed to only temporarily be in the position,
but it went on too long. He does not recall what she said about why no job code change was ever
done. (Brown Depo., p. 115)

Marcello conducted other interviews as well. He interviewed Personnel Manager Patricia Rose,
Tammy Tulloch, and Co-Manager Dan Henson. (Brown Depo, p. 121) In connection with the
investigation, Dan wrote a statement. (Brown Depo., p. 123) I have seen no other statements or
investigative reports in connection with this investigation.

That incident prompted Marcello to do a job code audit in the store. (Brown Depo., p. 116) He
concluded that other employees had been coded incorrectly as well. (Brown Depo, p. 119)
More specifically, he determined that twelve (12) to fifteen (15) employees were not coded
properly. (Brown Depo., p. 119) He further testified that these issues were discovered between
February 3 and February 10, 2009. (Transcript Bates PL – 000286)

Significantly, the listing of seventeen (17) employees who were miscoded is contained in a
memorandum dated March 14, 2009 – **_over a month_** after Karla was terminated. The
memorandum is from Tamara Tulloch to Marcello Brown, and the pay differential was "a $0.20

difference." (Exhibit 84) I am unaware of any evidence that these issues came to the Company's attention in February or earlier than March 14th.

B. *The Company Failed to Properly Investigate or Give Karla an Opportunity to Give a Verbal or Written Statement*

Most significantly, the Company admits that Karla was not provided with any opportunity at any time to explain whether she had knowledge of any of the circumstances surrounding the job coding of the three (3) employees in question -- which is why she was terminated. (Brown Depo, pp. 167-68; Adams Depo, p. 102) That is, the Company never interviewed Karla in connection with this job coding/wage and hour investigation. (Brown Depo., p. 125) The Company had already made the decision to terminate Karla for job coding violations before it even raised the issue with her. (Brown Depo., p. 125) The Company never showed her any documents in connection with job coding issues or gave her names of employees who may have been improperly job coded. (Brown Depo., p. 154)

Marcello Brown made assumptions that Karla was aware of job codes. When asked what evidence existed to demonstrate that Karla knew of improper coding, Marcello Brown stated that she was a "hands on manager" who was involved in hiring. (Brown Depo., p. 159) Roy Adams, on the other hand, admitted that he had no knowledge of any evidence that Karla was aware of job code issues, and he never talked to her about them nor did he ever look into them on his own or access the system. (Adams Depo., p.p. 95-96, 101-02)

Given Wal-Mart's definition of integrity, clearly the Company cannot properly say that Karla acted with any bad intent or dishonesty.

At the deposition, it became clear that many questions should have been asked of Karla and/or others about the job coding issue, but were not. For example, one of the three employees with the job code issues was Angelica Reyes, who was part of the in-stock team which was a code that belonged to the new store structure. Marcello did not know the code for donut crew, as she was coded. (Brown Depo., p. 162) And the coding existed as of January 8 and the report on the coding was dated February 10; Marcello was completely unaware that Karla may have been on a leave of absence from January 5 through January 18. (Brown Depo., p. 163) Olga would have been responsible, therefore, for any coding error. (Brown Depo, p. 164) In fact, a statement from this employee, as detailed in a February 4, 2009 email, describes Angelica's version of events, and Marcello Brown commented, "It is not good for Olga." (WM/KG 004003) Note no mention is made of any involvement of Karla. When asked what proof the Company had that Karla was aware of it, Marcello said that a former Co-Manager, Daniel Henson, said so. (Brown Depo, pp. 164-65) With regard to the second employee, Tammy Shouma, Marcello admitted that he did not investigate if she had a secondary job code. (Brown Depo., p. 165)

Daniel Henson's statements should have been investigated and explored in further detail. Marcello admits that Karla had given Daniel a coaching just weeks before he made statements that reflected negatively on Karla. (Brown Depo., p. 177) He purchased discounted wine before customers had the opportunity, contrary to Company policy, and was involved in other alleged misconduct as well such as giving away merchandise. (Brown Depo., p. 177) Nevertheless, the

Company didn't seem to consider whether he had any motive to implicate Karla or fabricate issues to Karla's detriment in retaliation for her recent adverse employment action against him.

Also, and significantly, the SMART system could have revealed which manager inputted the job coding to begin with, but no one even investigated this issue. (Adams Depo., pp. 105-06)

C. *The Company's Reason for Termination Is Not Consistently Supported by the Evidence*

Conflicting testimony is given as to the reason for Karla's termination. Wal-Mart, through the deposition testimony of Marcello Brown and Roy Adams, states that job coding was the reason for termination (and it is mentioned in a couple of the documents as well). (Brown Depo., p. 67; Adams Depo., p. 29) Yet, Career Preference issues appear regularly as the reason for the termination.

Several key documents exist relating to the termination decision. They include the Exit Interview form of Karla dated February 12, 2009; the Exit Interview form of Olga Guebara, dated February 12, 2009; the "Executive Summary of Events for Karla Grimes & Olga Guebara" prepared by Marcello Brown on an unknown date (Brown Depo., p. 131) but with a date of "Received 3/6/09" on it (Exhibit 62); and others, as referenced below.

And, at the June 9, 2009, unemployment hearing before the Appeals Tribunal of the Texas Workforce Commission, Marcello Brown was asked if Karla was responsible for the fifteen (15) job code violations that he mentioned. He responded, "Some may have been directly, some may have been indirectly. It is kind of hard to say because you can't really go back and look at the exact names on them." (Transcript Bates PL-0000286) Again, if this is the reason for termination, it is difficult to concern the integrity component of it.

Career Preference as the reason for the termination is identified in the following sources:

- On the Exit Interview form dated 2/12/09, in the section requesting "Detailed Statement of Termination," Roy Adams wrote, "Integrity issues involving career preference and circumvention of career preference." (Exhibit 34) Compare with Lynn Willis. In the Exit Interview form of Lynn Willis, who was terminated for job coding issues, Wal-Mart wrote that the termination reason was "Gross Misconduct – Integrity Issue." (Exhibit 87) It did *not* characterize the job coding issue as one of "career preference." Marcello Brown testified that Lynn Willis participated in an "elaborate scheme in order to hide" job codes which differed from actual jobs being performed. (Brown Depo., pp. 93-94) Certainly integrity was key in that case.

- The language on the Exit Interview form is virtually identical to the language in Olga's "Coaching for Improvement" notice on February 9, 2009 where she was cited for violating "career preference guidelines, [which] has hurt the integrity of the process." (Exhibit 79) Though the language is the same in the Coaching notice and termination notice, the reasons were supposed to be different. Clearly the Coaching language was in reference to the interviewing issue and not job coding, as job coding was not even

13

identified as an issue at this point in time. This point is also made in Keitha Keene's notes dated February 4, 2009 of a conversation she had with Karla, after Karla received the D-Day and demotion (not termination) because she "failed to ensure integrity on CP." (WM/KG 003984) See also typed notes of February 3, 2009 meeting where Karla was told she was "ultimately responsible for upholding the integrity of the career preference interview process." (WM/KG 003996)

- When Marcello Brown was shown the Exit Interview form relating to Karla's termination and asked why job codes were not mentioned, he responded, "There are two lines. There wasn't really enough room to spell everything out." (Brown Depo, p. 156) In reviewing the form, however, it is evident that ample room exists on the lines to add the words "job coding" to the "detailed statement" that is supposed to be given.

- When Roy Adams was asked why incorrect job codes was not listed in the Exit Interview form, he responded, "No particular reason." (Brown Depo., p. 154)

- At the unemployment hearing before the Appeals Tribunal of the Texas Workforce Commission on June 9, 2009, Marcello was asked if Karla would have been terminated if she or Olga Guebara had interviewed the two internal candidates, and he responded, "No sir." (Transcript Bates PL – 000287)

- Marcello was also asked at the hearing what conduct led to the termination, and he responded, "Basically based on... it all originally began with an interview process, not properly interviewing the people and..." (Transcript Bates PL – 000284) He then went on to explain that interviews were not properly carried out.

- At the time of termination, the Company walked Karla through her written statement, which is all about career preference issues and devoid of mention of job codes. According to the February 12, 2009 notes of the termination, Marcello asked her details including "time frame of situation, location of personnel involved, interview sheets, direction given." (Exhibit 82)

- At the hearing, after Marcello mentioned job code issues (and he later identified fifteen (15) incidents) as an additional incident, Marcello was asked if Roy Adams told Karla "any other reason for separation besides integrity issues referring to career path processes," and he responded, "No sir that was it." (Transcript Bates PL – 000285)

- Marcello Brown admitted that he obtained Christy Rodriguez's statement on February 10th at 4:51, two days before the termination occurred, and after the D-Day decision. (Brown Depo., p. 146; Exhibit 63) The statement was all about career preference and the interview forms, and it was silent as to job coding. If the interviews were not a factor in the termination decision, the Company should not have obtained the statement or even interviewed Christy, as it already had made the D-Day decision and demotion.

- Marcello Brown could not explain why job codes does not appear in his Executive Summary in the chronology of events before the decision to terminate. Instead, it is

14

identified as an issue after he described the termination and the facts leading to the termination decision. (Brown Depo., p. 153) This factor is most significant. The 3-page Executive Summary provides a chronological synopsis of events that transpired, beginning on January 26th and extending to the 27th to the 29th to the 30th and then to February 2, February 3, February 10, and finally February 12. The last three paragraphs of this chronological synopsis state as follows:

> Thursday Feb. 12, Karla was asked to report to the market office @ 1:30 p.m. She was walked through her own statement, then asked to leave the room for a few minutes. She later re-entered where she was then presented with facts that were in conflict with her statement. She was made aware that additional information involving her role in circumventing career preference had come to light ant that because of this, she would be terminated from Wal-Mart.

> Olga was later called into the office on the same date and terminated for the same reasons. She asked why things had changed, and was told that knew (sic) information had come to light that couldn't be ignored. At that point, Olga began to bring up names of past managers in the building who had known of their unethical practices and later called Marcello back to tell him to check in on store 537, that they have an associated (sic) coded under grocery who is working in lawn and garden

> *Upon conclusion of the investigation,* it was discovered through interviews of the personnel manager and a (sic) assistant manager, that there had been a practice of wage and hour violations by hiring associates under a higher paying job code only to do a lesser paying job (i.e. ICS but were working on the sales floor)[.] There were two associates that we owed back pay to due to the fact that they were doing a job and had not been job coded correctly. We also discovered a cash office associate that was coded as a ppg 6 CSS, but working on ppg5 cash office for over a year. (Emphasis supplied0

- As the Executive Summary states, the "Personnel Manager" provided information to Marcello Brown about job code issues. Marcello could not recall when he interviewed the Personnel Manager, who was Patricia Rose, but admits that it was *AFTER* the termination of Karla. (Brown Depo., p. 157-58) Patricia's statement is dated February 16, 2009, four (4) days after the termination, and "upon conclusion of the investigation," as Marcello states.

APP16

- In his Executive Summary, Marcello Brown stated that Karla "was made aware that additional information involving her role in circumventing career preference had come to light and that **because of this**, she would be terminated from Wal-Mart." (Exhibit 62) (Emphasis supplied)  In the chronology of events, the additional information seems to be two-part: (1) Co-Manager Yesenia Ortiz was questioned by Marcello about the interview process and contact by Karla; and (2) Christy Rodriguez provided a statement that revealed, among other things, that Karla was in the office (not hallway) talking to Olga for about 13.5 minutes in contrast to Karla's statement that she talked to Olga in the hallway for only fifteen (15) seconds.  When asked in his deposition specifically what "additional information" he referred to, Marcello responded the fifteen (15) second versus thirteen (13) minute conversation that Karla had with Olga.[4]  (Brown Depo., p. 151)

- Similarly, at the termination meeting on February 12, 2009, Marcello Brown recorded that Karla "was walked through her own statement," yet the statement is all about issues in connection with career preference and interview forms; it had nothing to do with job coding.  It defies logic that the Company would even discuss career preference and interview forms on February 12th if the decision had already been made before the meeting commenced that the reason for termination was job coding and not career preference issues.

- Roy Adams considered job pay and job code situations to be "wage and hour violations." (Adams Depo., p. 87)  In his deposition, Roy Adams clearly distinguishes the job code violations as distinct from the events that led to the termination.  More specifically, the following colloquy took place at his deposition:

> Q:     Did [Marcello] provide you any type of written report [relative to job coding issues]?
>
> A:     No.  Well, a summary of the events.
>
> Q:     Okay.  *He provided you a summary of the events relating to the job code violations?*
>
> A:     *No, just the overall events that led up to the D-day and termination.*  I don't think they got a summary of events on job codes, but I could be mistaken."

(Adams Depo., p. 90)

---

[4] He later changed his testimony and said that job coding was the additional information.  (Brown Depo., p. 154)

### D. *Industry Standards and Wal-Mart Policies*

In its Legal Report entitled "Cardinal Rules of Termination," first authored in July 1995 and updated in April 2010, SHRM advises employers seeking to terminate an employee to always "[p]inpoint the basis of the discharge." SHRM reiterates this cardinal rule in its online Human Resources Q & A response (dated August 2006) to the question: "Are there any 'best practices' relating to termination?"

SHRM's Legal Report warns employers that they may violate these key rules by failing to identify or articulate the reasons for termination, thus committing a mistake that "could be fatal." SHRM recommends, as a matter of best practice, that employers provide a terminated employee with a written copy of the reason for her discharge, rather than relying on an oral explanation of the basis for the discharge and a "recording of the reason somewhere in the employee's personnel file." Finally, SHRM recommends that, whenever possible, the employer should identify the specific rule or policy provision that the misconduct in question violates, adding "the more specific, the better."

In a recent article entitled "7th Circuit: Shifting Explanations for Employee's Termination Warrant Trial of Retaliation Claim," highlighting the case of *Loudermilk v. Best Pallet Co. Inc.*, No 08 C 6869 2/18/11, SHRM offers this "professional pointer:"

> When properly viewed, the evidence in this case did not pass the proverbial "smell test." This case serves as a reminder of two important maxims: (1) very close timing between an adverse action and protected activity will result in a much higher probability that a court will find inferences of retaliatory motive; and (2) employers offering multiple, conflicting reasons for an employee's termination invariably signal retaliatory motive.

SHRM offers further guidance on best practices relating to articulation of the reasons for termination in its sample form entitled "Termination: Status Change Form." Under "Reason for Termination," it states, "In addition to checking reason for termination, give full explanation in space below," and sets forth separate areas to "[e]xplain reason given above in detail" and for "[e]mployee's statement of reason for termination."

In the present case, Wal-Mart failed to adhere to the best practices as outlined above. Its only proffered reason for Karla's termination was "Integrity issues involving career preference and circumvention of career preference ," and its indication that she would not be eligible for rehire. Wal-Mart failed, however, to provide Karla with written documentation of the specific alleged conduct that gave rise to the decision to terminate, such as information pertaining to the job coding issues. As SHRM's June 2006 HR Magazine article, entitled "Legal Trends: Deconstructing Documentation," makes clear, documentation relating to employee conduct that "fails to focus on behavior has minimal value and sometimes may be damaging." As the article emphasizes:

Documentation that states general conclusions as opposed to describing specific behavior can create proof problems later. Recording that an employee has "bad judgment," for example, is worthless, without more explanation, from an evidentiary perspective.

SHRM thus recommends, as a matter of best practice, that employers train their supervisors to "drill down" and document exactly what it was that the employee did or did not do or say. The article provides the following illustration of how this "drill down" approach would work in a situation where an employee has a "bad attitude." Instead of relying on this subjective reason for disciplining an employee, the article encourages an employer to engage in the following exercise:

- "Bad attitude."
- Drill down: What did employee do or say? "Disrespectful."
- Drill down further: What did he say that was disrespectful? "Talked down to peers."
- Almost there; drill down a little more: How did he talk down to them? "Told a peer that the task was so simple that even he could do it."

In the present case, Wal-Mart failed to adhere to best practices when it provided nothing more than the vague and overbroad statement of "integrity issues involving career preference and circumvention of career preference" issues as the basis for Karla's termination, thus relying solely on the kind of "general conclusions" against which SHRM warns employers. Contrary to SHRM's best practice guidelines, Wal-Mart failed to "drill down" and provide documentation of the specific conduct in which Karla allegedly engaged as a legitimate basis for its decision to terminate her employment.

As outlined in the preceding section, Wal-Mart's Corporate Policy entitled "Investigations/ Suspension Policy" was referenced. The policy anticipates that investigations will properly include interviews and that the Company obtain an "Associate Statement" from the involved individual. It was, therefore, in derogation of its own internal policies that Wal-Mart denied Karla of the full and fair opportunity to tell her side of the story before it decided to terminate her employment.

Under the policy section entitled "Appropriate Action," Wal-Mart makes clear that an investigation into whether alleged conduct violates Company policy necessarily *precedes* the determination of whether disciplinary action is warranted:

Once the Investigation is completed, if there has been no violation of company policy, no disciplinary action will be taken. If there has been a violation of company policy, the Associate under investigation may be subject to disciplinary action, up to and including termination. The investigation materials must still be maintained regardless of the outcome of the investigation.

18

What is particularly troubling here is that Wal-Mart admits that it failed to conduct a reasonably adequate investigation into Karla's alleged misconduct relating to the job coding issue prior to making the decision to terminate her. The fact that Karla was never interviewed is a fatal flaw. Wal-Mart failed to allow Karla to review the issues. She was not presented with or given the chance to comment on the alleged job coding violations. The Company did not fully involve other witnesses or obtain statements from all those it interviewed. By failing to conduct a thorough investigation of the alleged misconduct that provided the proffered reason for its termination decision, Wal-Mart failed to adhere to sound employment practices.

In conclusion, Wal-Mart's actions are contrary to its policies and industry standards when it failed to conduct a fair and appropriate investigation and also by offering conflicting reasons for the termination decision. Ample evidence supports the fact that Karla was terminated because of career preference issues, and that those are distinct from job coding issues.

V.     *OPINION #3: WAL-MART FAILED TO ABIDE BY SOUND EMPLOYMENT PRACTICES OR ITS OWN POLICIES WHEN IT FAILED TO INVESTIGATE KARLA'S COMPLAINT THAT THE ADVERSE EMPLOYMENT ACTION MAY BE DISCRIMINATORY OR IN RETALIATION FOR HER DECLINING A PROMOTION BASED ON ISSUES SURROUNDING HER DISABLED SON*

     A.     *Factual Background*

At the February 3, 2009 meeting with Karla, Roy Adams and Becky Thomas present, Karla was advised that she was given a D-day with a demotion. Karla got very upset and continued to deny engaging in any misconduct. Karla then "asked Roy if [Home Office] was just mad because she had turned down a Market Manager Position." (Exhibit 78) She talked about making phone calls, but "the first one would not be to Wal-Mart," implying that she was going to contact legal counsel about perceived discrimination or retaliation.

This complaint by Karla is registered in a second document that Wal-Mart created and subsequently produced in the course of discovery. The document is dated February 3, 2009, and seems to be authored by Marcello Brown. Wal-Mart recorded that Karla "then asked, is this happening because I turned down the New Mexico position? We told her no."

Both Roy Adams and Marcello Brown admitted that Karla told them the reason she declined the New Mexico position was because of the schools. (Adams Depo, p. 149; Brown Depo, p. 201.)

This complaint by Karla should have been promptly and thoroughly investigated, so that Wal-Mart could have ensured that the termination was for a legitimate, non-discriminatory reason. It was never investigated. Instead, it was summarily dismissed by Wal-Mart, contrary to industry standards and Wal-Mart's own policies as articulated previously and below.

APP20

B.     *Industry Standards and Wal-Mart Policy*

As SHRM makes clear in its March 2010 article entitled "Expert Provides Guidance on Investigation Dilemmas," best practices dictate that an employer conduct a prompt and thorough investigation of any and all complaints of discrimination.

The SHRM treatise, "The Essential Guide to Workplace Investigations" (2007), makes clear, "The situation that triggers an investigation might come to [an employer's] attention in any number of ways, but [the] company's obligation to investigate doesn't depend on how you find out about the problem. Some employers mistakenly believe that they have a duty to investigate only formal complaints. This is wrong, however." (page 29) The Guide further states, "Once a manager knows, 'the company' knows." The Guide explains, "Managers and supervisors are the company's eyes and ears in the workplace. Because they are on the front lines, they are most likely to witness developing problems. In some cases, managers or supervisors might hear rumors or gossip about improper activities; sometimes, they hear complaints directly from unhappy workers. [The] company should train all managers to report any employee complaints, incidents of workplace wrongdoing, or even rumors of troublesome behavior... As a legal matter, once []managers are aware of a problem, the company is generally legally responsible for taking action to deal with the situation. If managers fail to report serious issues, [the] company may be on the hook for any harm that results --even if no one else ever learns of the problem." (pages 32-33)

Wal-Mart's Corporate Policy, entitled "Discrimination & Harassment Prevention Policy (PD-19)" explicitly states that all complaints of discrimination will be investigated, in accordance with this policy:

> We will take any reported violation of this Policy seriously. We will promptly and thoroughly investigate any report of possible violations of this Policy in accordance with the procedures set forth in the Management Guidelines for this Policy and THE RED BOOK.....

> We will take appropriate action to eliminate conduct that violates this Policy and to ensure that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported Policy violation...We will take further appropriate action once the reported violation has been thoroughly investigated.

(Exhibit 29)

This policy is mirrored by Wal-Mart's Corporate Policy entitled "Investigations/Suspension Policy," which provided as follows:

> When it is necessary to conduct an investigation regarding possible violations of Wal-Mart policies, the investigation should be handled promptly and thoroughly. The investigation will be focused on

determining if the allegations can be substantiated and what action, if any, is necessary....

NOTE. This policy is used for all investigations, except for fraud or theft issues....

The policy then goes on to specifically address "Harassment/Discrimination/Inappropriate Conduct Investigations," stating that:

• All supervisors/managers have an obligation to report cases or suspected cases of harassment/discrimination/inappropriate conduct to an appropriate level of management as detailed below.
• Allegations reported to Hourly Supervisors must be reported to a salaried member of management.
• All allegations of harassment/discrimination must be reported to and investigated by:
    • Facility Manager/Salaried People Manager (Wal-Mart Stores & SAM'S CLUB)
    • People Manager (Field Logistics)
    • People Director, People Manager or the Corporate Associate Relations Department (Home Office).

The policy also states that:

Harassment/Discrimination/Inappropriate Conduct allegations must be conducted by the Facility Manager/ Salaried People Manager or higher using the Investigation Report & Guide (IRG) of THE RED BOOK.... If the Facility Manager is out of the facility (i.e., vacation, leave of absence) another member of management must contact the District Manager/Director of Operations or Regional Personnel Manager to ensure the Investigation begins immediately. The Investigation Report & Guide and the following investigation forms can be printed from the link found at the end of this policy under Resources, Printed Materials, and THE RED BOOK Forms:

    Investigation Supplements
    Investigation Report & Guide
    Interview Checklist
    Witnessing Manager Notes
    Associate Statement
    Follow Up Interview Checklist
    Changes/Additions to Associate Statement

Additionally, Wal-Mart maintains a policy entitled, "Management Guidelines for Discrimination & Harassment Prevention Policy (PD-19) – National."

APP22

As both Wal-Mart's internal policies and best practices dictate, any complaint about discrimination, retaliation or other unlawful treatment compels an immediate investigation. Indeed, Wal-Mart's policies even go so far as to encourage employees to report such prohibited conduct, and Karla did so.

However, as the documentation and testimony of Wal-Mart officials confirm, Wal-Mart failed to uphold its obligations pursuant to both its own policies and best practices when it had notice of Karla's concerns of discrimination and/or retaliation and, nevertheless, failed to act and investigate.

*  *  *

Please do not hesitate to contact me if I can provide additional information to you.

Thank you.

Very truly yours,

Julie A. Moore



*Employment*
*Practices Group*

*Defining employers' rights in the workplace*

## *About* Julie A. Moore

Julie A. Moore is president and founder of Employment Practices Group. As an attorney, she is admitted to practice law in the State of New Hampshire and Commonwealth of Massachusetts. She has practiced for over nineteen (19) years and is a frequent author, lecturer, counselor, and trainer on workplace issues. She is the 2010-2011 Chair of the New Hampshire Bar Association Labor & Employment Section. She founded Employment Practices Group in 1998 to work with organizations on best practices of human resources management, consistent with the law and industry standards. She consults and advises on employment law and human resources issues; is retained as an independent investigator to conduct investigations into alleged harassment and misconduct; drafts policies, procedures and handbooks; trains employers on harassment and other workplace issues; defends employers and management representatives before state and federal administrative agencies; and otherwise assists and counsels employers on harassment, discrimination, ADA, FMLA, wage/hour, diversity, terminations, restrictive covenants, and other workplace issues. She also represents individuals on a limited basis on matters involving disability accommodation, performance issues, non-competition agreements, separation from employment, harassment charges, and other workplace matters.

Julie has been retained as an expert witness in various litigation matters in New Hampshire, Massachusetts, Maine, and Pennsylvania courts relative to sexual harassment, unlawful harassment, internal investigations, wrongful discharge, the Family and Medical Leave Act, the treatment of employees with disabilities under the Americans with Disabilities Act, terminations and disciplinary matters, reductions in force, hiring and retention, and other human resources issues involving workplace policies and practices. For example, she testified in a 2005 trial involving claims of wrongful termination, discrimination and retaliation in violation of N.H. RSA 354-A in Hillsborough County Superior Court (Conboy, J.), that resulted in a $480,000 verdict in the plaintiff's favor. She also testified as an expert for the plaintiff in a gender discrimination trial against Wal-Mart in 2007 in Berkshire County Superior Court (Agostini, J.), where the plaintiff received a $2 million verdict. This verdict has gained international attention, and Julie's role was highlighted in a June 28, 2007 article in *BusinessWeek* and a June 21, 2007 article in *Massachusetts Lawyers Weekly.* The Supreme Judicial Court, in an October 2009 decision, upheld the verdict. Julie's testimony was never challenged on appeal.

More recently, Julie testified as the plaintiff's expert in two trials in June 2010, both resulting in substantial victories. One case was tried in the Merrimack County Superior Court in Concord, New Hampshire, and Julie offered testimony about the employer's

1

layoff. A six-figure verdict was returned. The second case went to trial in the Business and Consumer Court in Cumberland County, Maine. Julie was retained by the former president of a company who had been accused of sexual harassment, and she testified about industry standards associated with conducting an internal investigation. The jury awarded a record $7.3 million in favor of the former company president.

Julie was recently named to be a 2010 New England Super Lawyer as well as a Massachusetts Super Lawyer. Such honor is based on a statewide nomination process, resume review, independent research of candidates, and peer evaluation. Only five percent of Massachusetts lawyers are chosen each year. Julie's name appears in the October 19, 2010 edition of *Boston* magazine as a result of this distinction.

Julie has been a regular contributor to many publications, including the *New Hampshire Business Review*, and has published articles in such other publications as *Massachusetts Lawyers Journal, New Hampshire Bar Journal, New Hampshire Bar News, The Union Leader*, and newsletters for various human resources organizations and trade associations throughout New England. She has been consulted and quoted on workplace issues in such publications as *Inc. Technology, The Eagle Tribune, New Hampshire Bar News, New Hampshire Bar Journal, New Hampshire Business Review, and The Concord Monitor.*

Most recently, Julie was quoted in a February 24, 2011 article for Society for Human Resources Management ("SHRM") entitled "Diversity Training Pitfalls to Avoid."

Julie is a certified trainer, and was a member of the 2008 faculty for the Massachusetts Commission Against Discrimination ("MCAD") two-day Discrimination Prevention Training Program *"Conducting Internal Discrimination Complaint Investigations."* In addition, in 2010, she successfully completed the MCAD training on disability discrimination and responding to accommodation requests.

As a member of the Board of Directors and Program Committee Chair of the Greater Merrimack Valley Human Resources Association, a SHRM chapter, Julie has been active in human resources groups on a local and national level. She regularly attends meetings that provide the opportunity for learning, education and sharing of best practices and discussion of industry standards. Julie was invited to attend and has participated in the 2007, 2008, 2009 and 2010 HR State Council of New Hampshire Leadership Conferences in Concord, New Hampshire. These are among the many programs Julie attends that count as credit hours toward PHR, SPHR and GPHR recertification through SHRM's Human Resource Certification Institute. Julie is presently a candidate for the SPHR certification.

In addition, in conjunction with Julie's leadership in her local SHRM chapter, Julie is the Legislative Liaison to SHRM for her chapter. She participated in the 2008 SHRM Leadership Conference in Arlington, Virginia, which is by invitation only and available only to SHRM volunteer leaders. The purpose of the annual meeting is to advance the HR profession through leadership development workshops and practice-sharing sessions.

APP25

She was also the local representative to the SHRM 2009 Employment Law and Legislative Conference, which was held in Washington, D.C. in March of 2009 and the SHRM Annual Conference and Expo, which was held in New Orleans in May of 2009. She was on the Committee to organize and was a featured speaker at the "1st Annual HR State Council of NH Legislative Conference," sponsored by the New Hampshire State Council for the Society of Human Resources Management and the Granite State Human Resources Conference and held in May 2010.

Julie has worked with the federal Equal Employment Opportunity Commission ("EEOC") on discrimination and harassment cases. For example, in 2005, she was retained, with the EEOC's approval, as an Independent Consultant to a large employer pursuant to the terms of a Consent Decree negotiated with the EEOC. She was charged with reviewing and identifying weaknesses in the employer's policies on harassment, discrimination and retaliation and re-drafting them. She drafted new workplace policies and procedures on internal complaints, management's responsibilities upon receipt of a complaint, and conducting investigations. She conducted company-wide training for managers and non-supervisory personnel. She conducted one-on-one sensitivity training with the executive accused of sexual harassment. She is designated as part of the company's internal complaint procedure for the next four years, if any employee feels victimized by workplace harassment. Through the end of 2008, she reported quarterly harassment to the EEOC on the company's compliance with the Consent Decree.

In 2006, she was again retained to work with the EEOC and an employer. In that case, she conducted training for all employees and managers on the discrimination laws, lawful hiring, and the Americans with Disabilities Act. She created policies on record retention and equal employment opportunity. She is otherwise acting as a legal consultant to ensure the employer complies with the applicable Consent Decree.

Much of Julie's work involves training and workshops on a variety of topics, including sexual harassment, unlawful harassment, discrimination, the ADA, FMLA, diversity, conducting investigations, workplace violence, hiring and firing, performance management and other workplace issues. Julie conducts in-house seminars for employers and also speaks at employment seminars offered by the New Hampshire Bar Association, Massachusetts Bar Association, Massachusetts Employment Lawyers Association, Council on Education and Management, Lorman Education Services, National Business Institute, and at various meetings for trade organizations, such as the National Human Resources Association, Northeast Human Resources Association, a SHRM chapter, Manchester Area Human Resources Association, a SHRM chapter, Greater Merrimack Valley Human Resources Association, a SHRM chapter, Associated Builders & Contractors, Inc., NH/VT Chapter, Northeast Passenger Transportation Association, Nashua Chamber of Commerce, National Association of Women in Construction, Women in Technology International, American Society for Training and Development, and New Hampshire Women's Business Center.

Recently, Julie's speaking engagements have included talks on a national level, as she spoke at the BLR 2010 National Employment Law Update in Las Vegas, and will be

speaking at an American Bar Association conference in March 2011 on the use of employment practices experts.

Julie also acts as a trainer and internal investigator for clients of Morgan, Lewis & Bockius LLP, a global firm with over 1,300 attorneys worldwide.

Prior to founding Employment Practices Group, Julie practiced employment litigation in Boston at Jackson Lewis, a national law firm specializing in management-related employment issues. She represented employers before federal and state courts and administrative agencies in Massachusetts, New Hampshire, Maine and Vermont. She defended companies and organizations in matters involving sexual harassment, unlawful harassment, discrimination, disability accommodation, wrongful discharge, breach of contract and other common law claims. She assisted employers in developing employment policies, procedures and risk-management strategies. She counseled clients on personnel practices and guided company management on conducting internal investigations on sexual harassment complaints and other issues involving employee misconduct. She spoke at numerous seminars for firm clients and prepared manuals on employment law developments.

Julie also gained extensive experience working at Devine, Millimet & Branch, one of the largest law firms in northern New England, in its Manchester office, defending companies and individuals in various litigation matters concerning employment issues, personal injury, and insurance coverage matters.

Julie graduated from Suffolk University Law School, *cum laude*, in 1992 where she was a technical editor for the *Suffolk University Law Review* and the recipient of the American Jurisprudence Award in Federal Courts. She also received a Bachelor of Arts degree in Economics, *summa cum laude*, in 1988 from Boston College. She has completed over forty (40) marathons, including nineteen (19) Boston Marathons. In April 2010, she successfully completed the "Boston 2 Big Sur Challenge," which consisted of running the Boston Marathon and Big Sur Marathon (in California) six (6) days apart. She is registered for both events again for April of 2011.

In addition, Julie is a member and leader of a number of professional associations and community and civic organizations. They include:

- Member, American Bar Association
- Member, New Hampshire Bar Association (NHBA)
- Member, Massachusetts Bar Association
- Chair, NHBA Section of Labor & Employment Law
- Member, Continuing Legal Education Committee of NHBA
- Member, California Association of Workplace Investigators
- Co-Chair, NHBA Continuing Legal Education (CLE) program "Employment Law 101: Life Cycle of a New Hampshire Employee"

- Co-Chair, NHBA CLE program "Legal Developments at the EEOC: Important New Changes on Disability Accommodation, Religious Discrimination, and Caregiver Responsibilities"
- Chair, NHBA CLE program "Discovery Issues in Employment Law"
- Chair, NHBA CLE program "Practicing before the EEOC"
- Chair, NHBA CLE program "Legal and Ethical Implications of Ex Parte Communications with Current and Former Employees of Parties Before or During Litigation"
- Chair, NHBA CLE program "Human Resources Management for Law Firms"
- Speaker, NHBA Annual Labor and Employment Law Update
- Speaker, Massachusetts Bar Association Labor and Employment Law Update
- Former Board Member and Program Director, New Hampshire Women's Bar Association
- Former Chair, NHBA Law Day Road Race Subcommittee
- Former Member, Women's Business Center Advisory Board
- Member, Sexual Harassment in Education Task Force sponsored by the New Hampshire Department of Education and the New Hampshire Commission on the Status of Women
- Board Member and Chair of Programming Committee, Merrimack Valley Human Resources Association
- Member, National Human Resources Association
- Member, Society for Human Resources Management
- Member, American Society for Training & Development
- Former Vice-President, Greater Derry Track Club Board of Directors
- Member, Merrimack Valley Striders
- Former Race Director, NHBA Law Day 5-Miler, AmeriBrew 5K Run, Windham Strawberry Festival 5K Road Race

A lengthy listing of publications and speaking engagements is available upon request.



*Employment*
*Practices Group*

*Defining employers' rights in the workplace*

# Julie A. Moore, Esquire
## Publications

**"Managing Social Media at Work"**
*Construction Resource*
Winter 2011

**"Essential Employment Policies for Your Workforce"**
*PMQ Pizza Magazine*
April 2011

**"Client Confidences, Communications and Representing Clients in Sexual Harassment Investigations"**
*New Hampshire Bar Association's 10th Annual Labor & Employment Law Update"*
April 8, 2011

**"Social Media in the Workplace: the Basics"**
*New Hampshire Bar News*
April 2011

**"2011 Report of the Workplace Investigations Subcommittee of the Employment Rights & Responsibilities Committee Section of Labor and Employment Law, American Bar Association"** (contributed First and Second Circuit Case Summaries)
March 26, 2011

**"Labor & Employment Law Research Guide 2010"**
*New Hampshire Bar Association Practical Skills Seminar*
December 8, 2010

**"Sexual Harassment Prevention: Recipes for Success"**
*PMQ Pizza Magazine*
November 2010

**"When the Words Get in the Way: Legal, Effective Scripts for Terminations and Other Tough Topics"**
*Business & Legal Reports (BLR) 2010 National Employment Law Update*
October 27, 2010

**"Bullying: Dramatic Changes for NH Schools – and the Workplace?"**
*New Hampshire Bar News*
October 15, 2010

**"Employment Practices Experts: Strategies, Ethics and Lessons Learned"**
*New Hampshire Association for Justice seminar "Big Verdicts in New England Employment Cases"*
October 15, 2010

**"Terminations and Reductions in Force: Best Practices for Separating Employees and Other Performance Management Practice Tips"**
*Lorman Education Services*
October 6, 2010

**"Labor & Employment Law Research Guide 2009"**
*New Hampshire Bar Association Practical Skills Seminar*
June 9, 2010

**"Discrimination: Practice Tips and Technology Issues"**
*Massachusetts Bar Association Labor and Employment Annual Conference*
May 11, 2010

**"Legislative Update"**
*Granite State Human Resources Conference and Legislative Conference*
May 10, 2010

**"Ethics and Social Media"**
New *Hampshire Bar Association Continuing Legal Education Program "9th Annual Labor & Employment Law Update"*
April 9, 2010

**"Labor & Employment Law Research Guide 2009"**
*New Hampshire Bar Association Practical Skills Seminar*
December 9, 2009

**"Performance Management and Investigations"**
*New Hampshire Bar Association Employment Law 101: Lifecycle of New Hampshire Employee*
November 13, 2009

**"Disability Discrimination and Accommodation: The Requirements under the ADA and State Law"**
*New Hampshire Adjusters' Association Annual Conference, "Return to Work: ADA, FMLA, and Worker's Compensation"*
November 5, 2009

APP30

**"Labor & Employment Law Research Guide 2009"**
*New Hampshire Bar Association Practical Skills Seminar*
June 10, 2009

**"Labor Law Initiatives for '09: An Overview"**
*New Hampshire Business Review, Volume 31, No.3*
January 30 – February 12, 2009

**"Labor Law Agenda for 2009 and Its Impact on Employers"**
*New Hampshire Bar News*
January 16, 2009

**"Conducting a Reduction in Force: Legal and Practical Considerations"**
*Lorman Education Services seminar entitled "Employee Discharge and Documentation in Massachusetts"*
November 12, 2008

**"Ethics and Professionalism Issues in Workplace Investigations: Role of the lawyer and Lawyers as Witnesses"**
*New Hampshire Bar Association (NHBA) Continuing Legal Education program, 7th Annual Labor and Employment Law Update*
April 3, 2008

**"Reducing Your Workforce without Fouling the Other Side"**
*Lorman Education Services seminar entitled Employee Discharge and Documentation*
January 8, 2008

**"Law Practice Management: A New Year's Resolution: Review Employment Handbooks and Policies"**
*New Hampshire Bar News*
January 4, 2008

**"Retaining Employees By Teaching and Training Them on Harassment and Discrimination"**
*Lorman Education Services program entitled "Maximizing Employee Retention and Job Satisfaction: Current Trends, Techniques, Communication and Training in Employee Recognition in Massachusetts"*
November 27, 2007

APP31

**"Disabled Workers Gain More Rights under NH Law"**
*New Hampshire Bar News*, Vol. 17, No. 20
May 18, 2007

**"Legal Update on Sex, Age, and Disability Discrimination and Harassment"**
*New Hampshire Bar Association 6th Annual Labor and Employment Law Update*
April 4, 2007

**"Internal Investigations of Harassment and Other Employee Misconduct"**
*Northeast Human Resources Association ("NEHRA") Professional Development Seminar*
March 6, 2007

**"ADA, Reasonable Accommodation and the Interactive Process"**
*New Hampshire Adjustors' Association*
October 19, 2006

**"Recent Massachusetts and First Circuit Cases on FMLA"**
*Lorman Education Services*
June 23, 2006

**"Employment Law Update: Harassment, Discrimination, ADA, FMLA, and Performance Management"**
*New Hampshire Association of Broadcasters*
June 21, 2006

**"Reducing the Potential for Discrimination and Harassment Liability"**
*National Business Institute program Advanced Employment Law: Working Through Common Problems*
June 19, 2006

**"The Internal Investigation: How It Should Be Conducted"**
*National Employment Lawyers Association ("NELA")*
May 19, 2006

**"Disability and Religious Discrimination Legal Update"**
*New Hampshire Bar Association Continuing Legal Education Program 5th Annual Labor and Employment Law Update*
April 5, 2006

**"The Hallmarks of Legally Defensible Documentation"**
*National Business Institute*
March 10, 2006

APP32

**"Creating Comprehensive Employee Handbooks"**
*National Business Institute*
February 27, 2006

**"Internal Investigation of Harassment and Other Employee Misconduct"**
*Northeast Human Resources Association*
November 17, 2005

**"Properly Handling an Employee Complaint in New Hampshire"**
*Lorman Education Services*
November 15, 2005

**"Workplace Romance and Sexual Harassment Claims"**
*Boston Genesys 25th Human Capital Management Conference*
September 26, 2005

**"Supreme Court Limits Permissible Scope of Non-Compete Clause in Employment Agreements"**
*New Hampshire Bar News*
August 12, 2005

**"Legal Update and Hiring/Firing Issues"**
*Granite State Legal Administrators Association*
September 13, 2005

**"Employee Handbooks: Drafting and Enforcing Sound Procedures and Policies"**
*National Business Institute*
February 1, 2005

**"Conducting Effective Sexual Harassment Investigations"**
*New Hampshire Bar Association Continuing Legal Education program The Law of Sexual Harassment*
December 10, 2003

**"Effectively Utilizing Experts on Employment Practices in Sexual Harassment Cases"**
*New Hampshire Bar Association Continuing Legal Education program The Law of Sexual Harassment*
December 10, 2003

**"Sexual Harassment Basics"**
*Lorman Education Services*
November 5, 2002

APP33

**"Employment Practices"**
*Lorman Education Services*
July 23, 2002

**"Legal Update – 2001 Employment and Labor Laws"**
*National Human Resources Association*
January 14, 2002

**"Harassment and Hazing"**
*Lorman Education Services*
December 5, 2001

**"Defining Sexual Harassment"**
*Lorman Education Services*
November 2, 2001

**"Bullying and Other Issues - Part 2"**
*Primex Loss Prevention Bulletin #2*
May 2001

**"Bullying and Other Issues - Part 1; Bullying – and Other Issues of Student Misconduct"**
*Primex Loss Prevention Bulletin #1*
May 2001

**"Employment Law"**
*Paralegal Association of New Hampshire Newsletter*, Vol. 10, No. 2
April – June 2001

**"Is it Dead or Alive? Employment-at-Will"**
*NH Notables (National Human Resources Association – New Hampshire Affiliate)*
April 2001

**"Harassment Law for Municipal Employers"**
New Hampshire Bar Association Continuing Legal Education program *Municipal and School Liability Seminar*
October 12, 2000

**"Summary of School Liability for Sexual Harassment"**
New Hampshire Bar Association Continuing Legal Education program *Municipal and School Liability Seminar*
October 12, 2000

**"Workers Comp Ruling Puts Stress on Ability to Criticize Employee"**
*New Hampshire Business Review, Volume 22, No. 21*
September 22 – October 5, 2000

APP34

**"Avoiding Litigation Can Mean Having To Say You're Sorry"**
*New Hampshire Business Review*, Volume 22, No. 19
August 25 – September 7, 2000

**"New Discrimination Law Gives Courts Jurisdiction"**
*New Hampshire Business Review*, Volume 22, No. 17
July 28-August 10, 2000

**"Litigation is a Painful, Costly Learning Experience"**
*New Hampshire Business Review*, Volume 22, No. 14
June 30-July 13, 2000

**"What's an Effective Defense Against Retaliation Charges"**
*New Hampshire Business Review,* Volume 22, No. 12
June 2-15, 2000

**"Eight Elements for an Effective E-Mail Policy"**
*Construction Resource,* Volume 6, No. 4
Spring 2000

**"There's Plenty to Think About before Terminating an Employee: Severance Agreements May Make a Difficult Job Easier"**
*New Hampshire Business Review,* Vol. 22, No. 8
April 7-20, 2000

**"NH District Court Rulings on Workplace Sexual Harassment Reviewed"**
*New Hampshire Bar News,* Vol. 10, No. 21
April 5, 2000

**"How to Deal with Family, Medical Leave Act Maze"**
*New Hampshire Business Review,* Vol. 22, No. 6
March 10-23, 2000

**"Family and Medical Leave Act Can Be Daunting"**
*New Hampshire Business Review,* Vol. 22, No. 4
February 11-24, 2000

**"Start of New Year is a Good Time to Review Employment Practices"**
*New Hampshire Business Review,* Vol. 22, No. 2
January 14-27, 2000

**"Legal Update: Employment Practices Audit"**
*National Human Resources Association NH Notables*
Winter 1999-2000

APP35

**"Unlawful Harassment Can Leave Employers Exposed"**
*New Hampshire Business Review,* Vol. 21, No. 27
December 17-30, 1999

**"Ill-Prepared Employee Handbooks are a Lawsuit Waiting To Happen"**
*New Hampshire Business Review,* Vol. 21, No. 24
November 19-December 2, 1999

**"E-Mail Opens Up World of Legal Risks for Employers"**
*New Hampshire Business Review,* Vol. 21, No. 23
October 22-November 4, 1999

**"Nothing Prohibits New Hampshire Employers from Testing Workers for Drugs"**
*The Union Leader*
October 1, 1999

**"A Thorough Hiring Process Can Eliminate Problems Later On"**
*New Hampshire Business Review,* Vol. 21, No. 19
September 10-23, 1999

**"Ex-Employer Has Responsibility to Tell Truth in Reference Checks"**
*The Union Leader*
August 27, 1999

**"Top Court's Decision Changes the ADA Landscape"**
*New Hampshire Business Review,* Vol. 21, No. 17
August 13-26, 1999

**"New Supreme Court Ruling Provides Title VII Road Map"**
*New Hampshire Business Review,* Vol. 21, No. 16
July 16-29, 1999

**"Latest Harassment Ruling Sends a Message: Pay Now or Pay Later"**
*New Hampshire Business Review,* Vol. 21, No. 13
June 18-July 1, 1999

**"The Ethics of Ill-Gotten Gains: If It's Too Good to Be True, Maybe It's Too Good"**
*New Hampshire Bar Journal,* Vol. 40, No. 2
June 1999

**"Make Sure There Are No Bumps in the Road to Termination"**
*New Hampshire Business Review,* Vol. 21, No. 11
May 21-June 3, 1999

APP36

**"Minimizing Employer's Liability to Alleged Sexual Harassers"**
*Massachusetts Bar Association Lawyers Journal*, Vol. 6, No. 9
May 1999

**"Warning: Direct-Mail Offers Are Not What They Seem"**
*New Hampshire Business Review,* Vol. 21, No. 9
April 23-May 6, 1999

**"Discovery and an Employer's Sexual Harassment Policies, Internal Investigations,
and Training Materials"**
New Hampshire Bar Association Continuing Legal Education program *Discovery Issues in
Employment Law*
April 15, 1999

**"Pitfalls Abound in Internal Harassment Investigations"**
*New Hampshire Business Review,* Vol. 21, No. 7
March 26-April 8, 1999

**"N.H. Supreme Court Clarifies Definition of Personnel Files"**
*New Hampshire Bar News*
March 3, 1999

**"An Update on the Law of Personnel Files"**
*NH Notables,* National Human Resources Association, New Hampshire Affiliate
March 1999

**"Sexual Harassment Investigations and Good-Faith Firings of Alleged Harassers –
What is the Jury's Role?"**
*New Hampshire Bar Journal*, Vol. 40, No. 1
March 1999

**"E-Mail is Not the Be-All and End-All in Office Communication"**
*New Hampshire Business Review,* Vol. 21, No. 4
February 12-25, 1999

**"No Sex Harassment Policy Can Be a Very Costly Mistake"**
*New Hampshire Business Review,* Vol. 21, No. 2
January 15-28, 1999

**"Workplace Romance: Deflect Cupid's Arrows Before It's Too Late"**
*You and The Law,* Vol. 28, No. 12, National Institute of Business Management
December 1998

**"Personnel Files: A Pandora's Box for Unprepared Employers"**
*New Hampshire Business Review,* Vol. 20, No. 25
November 20- December 3, 1998

**"Sex in the Executive Suite: What Policy is in Order?"**
*New Hampshire Business Review,* Vol. 20, No. 23
October 23–November 5, 1998

**"By Law, What Constitutes Sexual Harassment in Workplace?"**
*The Union Leader*
 September 25, 1998

**"Million-Dollar Sex Discrimination Suit Offers Lessons to Learn"**
*New Hampshire Business Review,* Vol. 20, No. 20
September 11-24, 1998

**"Employers in the Sexual Harassment Arena: Take Caution"**
*New Hampshire Business Review,* Vol. 20, No. 16
July 17-30, 1998

**"Not Here, Not Now:  How to Summarily Resolve Hostile Environment Sexual Harassment Cases"**
*New Hampshire Bar Journal,* Vol. 39, No. 2
June 1998

**"U.S. Supreme Court Rules Same-Sex Harassment Unlawful"**
*New Hampshire Bar News*
April 1, 1998



*Employment*
*Practices Group*

*Defining employers' rights in the workplace*

# Julie A. Moore
## Speaking Engagements

| | |
|---|---|
| April 8, 2011 | *"Client Confidences, Communications and Representing Clients in Sexual Harassment Investigations"*<br>10th Annual Labor & Employment Update 2011<br>New Hampshire Bar Association (NHBA) Continuing Legal Education program<br>NHBA Seminar Room<br>Concord, NH |
| March 26, 2011 | *"Finding Buried Workplace Treasure -- Then Using it at Trial: Using an Investigations Expert in Employment Cases,"*<br>Moderator of Panel<br>American Bar Association ("ABA") Section of Labor and Employment Law, 2011 Midwinter Meeting<br>La Concha Resort<br>San Juan, Puerto Rico |
| February 10, 2011 | *"Mediation for Employment Attorneys: Preparation, Nuts and Bolts, and Closing the Deal"*<br>Program Chair<br>NHBA Labor and Employment Section Meeting<br>NHBA Seminar Room<br>Concord, NH |
| December 8, 2010 | *"Employment Law Issues – NH Specific Practice Pointers"*<br>New Hampshire Bar Association (NHBA) Practical Skills Course<br>Grappone Conference Center<br>Concord, NH |
| November 18, 2010 | *"The EEOC- a Full Commission and New Directions"* with Area Director Robert Sanders<br>Moderator of Program<br>NHBA Labor and Employment Section Meeting<br>NHBA Seminar Room<br>Concord, NH |

| | |
|---|---|
| October 27, 2010 | *"When the Words Get in the Way:  Legal, Effective Scripts for Terminations and Other Tough Topics"*<br>2010 National Employment Law Update Presented by Business & Legal Reports (BLR)<br>The Venetian<br>Las Vegas, NV |
| October 15, 2010 | "Employment Practices Experts:  Strategies, Ethics and Lessons Learned"<br>*New Hampshire Association for Justice seminar "Big Verdicts in New England Employment Cases,"*<br>SERESC Conference Center<br>Bedford, NH |
| October 13, 2010 | *"Sexual Harassment:  What Property Managers Need to Know"*<br>Granite State Managers Association Annual conference<br>Attitash Grand Resort<br>Bartlett, NH |
| October 6, 2010 | *"Terminations and Reductions in Force:  Best Practices for Separating Employees and Other Performance Management Practice Tips"*<br>Lorman Education Services<br>The Yard<br>Manchester, NH |
| June 10, 2009 | *"Employment Law Issues – NH Specific Practice Pointers"*<br>New Hampshire Bar Association (NHBA) Practical Skills Course<br>Grappone Conference Center<br>Concord, NH |
| May 11, 2010 | *"Discrimination:  Practice Tips and Technology Issues,"*<br>Massachusetts Bar Association Labor and Employment Annual Conference<br>Boston Colonnade Hotel<br>Boston, MA |
| May 10, 2010 | *"Legislative Update"*<br>Granite State Human Resources Conference Legislative Conference<br>Radisson Hotel<br>Manchester, NH |

| | |
|---|---|
| April 27, 2010 | *"How to Best Deal with Expert Witness Testimony"*<br>Massachusetts Employment Lawyers Association meeting<br>Rodgers, Powers & Schwartz, LLP<br>Boston, MA |
| April 9, 2010 | *"Ethics and Social Media"*<br>9th Annual Labor & Employment Update 2010<br>New Hampshire Bar Association (NHBA) Continuing Legal<br>Education program<br>NHBA Seminar Room<br>Concord, NH |
| February 2, 2010 | *"Employer Tools for Employee Relations"*<br>Manchester Area Human Resources Association<br>The Derryfield<br>Manchester, NH |
| December 9, 2009 | *"Employment Law Issues – NH Specific Practice Pointers"*<br>New Hampshire Bar Association (NHBA) Practical Skills Course<br>Grappone Conference Center<br>Concord, NH |
| November 13, 2009 | *"Performance Management and Investigations"*<br>Employment Law 101—The Life Cycle of a New Hampshire<br>Employee<br>New Hampshire Bar Association (NHBA) Continuing Legal<br>Education program<br>NHBA Seminar Room<br>Concord, NH |
| November 5, 2009 | *"Disability Discrimination and Accommodation: The*<br>*Requirements under the ADA and State Law"*<br>New Hampshire Adjusters' Association Annual Conference,<br>Program Entitled "Return to Work: ADA, FMLA, and Worker's<br>Compensation"<br>Mt. Washington Hotel<br>Bretton Woods, NH |
| October 14, 2009 | *"Sexual Harassment Issues: Prevention, Investigation and*<br>*Remediation"*<br>Granite State Managers Association Annual Conference<br>The Balsams<br>Dixville Notch, NH |

APP41

June 23, 2009     *"Current Issues in Employment Law"*
New Hampshire Bar Association (NHBA) Labor & Employment
Section Meeting
NHBA Center Seminar Room
Concord, NH

June 10, 2009     *"Employment Law Issues – NH Specific Practice Pointers"*
New Hampshire Bar Association (NHBA) Practical Skills Course
Grappone Conference Center
Concord, NH

April 8, 2009     *"Workplace Investigations: The Good, the Bad, and the Ugly"*
MBA Luncheon Roundtable
Massachusetts Bar Association
Boston, MA

April 7, 2009     *"Sexual Harassment Issues: Prevention, Investigation, and Remedial Action"*
Apartment Association of New Hampshire Quarterly Executive
Breakfast: Human Resources Issues
Bay Ridge at Nashua Apartments
Nashua, NH

April 2, 2009     *"Ethical Issues in Internal Investigations from Factfinding to Litigation"*
8th Annual Labor and Employment Law Update
New Hampshire Bar Association (NHBA) Continuing Legal
Education program
NHBA Seminar Room
Concord, NH

March 16, 2009     *"Legal Update: Family Responsibility Discrimination, Internal Investigations; and Best Practices in Conducting Reductions in Force"*
Greater Merrimack Valley Human Resources Association, SHRM
Chapter
Chunky's Cinema and Pub
Haverhill, MA

January 27, 2009     *"Data Security Law: Human Resource Obligations"*
Moderator of Program
Greater Merrimack Valley Human Resources Association, SHRM
Chapter
Chunky's Cinema and Pub
Haverhill, MA

APP42

January 23, 2009     *"Legal Developments at the EEOC: Important New Changes on Disability Accommodation, Religious Discrimination, and Caregiver Responsibilities"*
Co-Moderator of Program
2009 Mid-Winter Meeting of the New Hampshire Bar Association (NHBA) Continuing Legal Education program
Radisson Hotel/Center of New Hampshire
Manchester, NH

January 15, 2009     *"New ADA Amendments Act and Disability Accommodation: Is Your Business Ready to Comply?"*
Concentra Lunch and Learn Program
Nashua City Hall
Nashua, NH

November 12, 2008     *"Conducting a Reduction in Force: Legal and Practical Considerations"*
Lorman Education Services Seminar entitled *"Employee Discharge and Documentation in Massachusetts"*
Holiday Inn Boston -Dedham Hotel & Conference Center
Dedham, MA

November 12, 2008     *"Conducting Internal Investigations into Employee Misconduct"*
Greater Merrimack Valley Human Resources Association, SHRM Chapter
Northern Essex Community College Corporate & Community Education Center
North Andover, MA

October 29, 2008     *"Sexual Harassment and Domestic Violence: Creating Awareness, Preventative Measures, and Corrective Action"*
3rd Annual Tri-State Housing Conference on Sexual Harassment and Domestic Violence
Lake Morey Resort, VT

October 21, 2008     *"Common Employee Issues: Terminations, Policies, and Workplace Romance"*
Apartment Association of New Hampshire Quarterly Executive Breakfast: Human Resources Issues
Royal Crest Estates
Nashua, NH

June 3, 2008     *"Documentation and Discharge under the Law"*
New Hampshire Association of Broadcasters
Concord, NH

| | |
|---|---|
| May 14-15, 2008 | *"Massachusetts Commission against Discrimination: Conducting Internal Discrimination Complaint Investigations"*<br>MCAD Discrimination Prevention Training Program<br>The Conference Center at Bentley College<br>Waltham, MA |
| April 3, 2008 | *"Ethics and Professionalism Issues in Workplace Investigations: Role of the lawyer and Lawyers as Witnesses"*<br>7th Annual Labor and Employment Law Update<br>New Hampshire Bar Association (NHBA) Continuing Legal Education program<br>NHBA Seminar Room<br>Concord, NH |
| March 29, 2008 | *"A Prescription for Handling the Difficult Employee"*<br>NH Society of Health System Pharmacists Annual Cabin Fever Meeting<br>Red Jacket Inn<br>North Conway, NH |
| January 8, 2008 | *"Reducing Your Workforce Without Fouling the Other Side"*<br>*"Creating and Maintaining Positive Documentation"*<br>Lorman Education Services program entitled *"Employee Discharge and Documentation in Massachusetts"*<br>New Bedford, MA |
| November 28, 2007 | *"The Firing Block: Strategies to Prevent Lawsuits Arising from Termination"*<br>Council on Education in Management's seminar entitled "Recent Developments in Employment Law 2007"<br>Manchester, NH |
| November 27, 2007 | *"Empowering Supervisors with Knowledge of Employment Laws"*<br>Lorman Education Services program entitled "Fundamentals of Employee Recognition and Retention Programs"<br>Boston, MA |
| June 13, 2007 | *"Sexual Harassment Update: How Law Firms Can Protect Themselves"*<br>Granite State Legal Administrators Association<br>New Hampshire Bar Association Bar Center<br>Concord, NH |
| May 23, 2007 | *"The Essentials of Conducting Workplace Investigations"*<br>New Hampshire Association of Broadcasters<br>Concord, NH |

| | |
|---|---|
| April 4, 2007 | *"Employment Discrimination (State and Federal Law): The Practitioners' and Agency Perspective on Recent Developments"* 6th Annual Labor and Employment Law Update New Hampshire Bar Association (NHBA) Continuing Legal Education program NHBA Seminar Room Concord, NH |
| March 24, 2007 | *"A Prescription for Preventing Workplace Harassment"* NH Society of Health System Pharmacists Annual Cabin Fever Meeting Red Jacket Inn North Conway, NH |
| March 6, 2007 | *"Internal Investigations of Harassment and Other Employee Misconduct"* Northeast Human Resources Association ("NEHRA") Conference Center at Water's Edge Beverly, MA |
| March 1, 2007 | *"Conducting a Thorough Investigation: Getting to the Truth, Protecting Privacy Rights, and Documentation Tips that Will Keep You Out of Hot Water"* Council on Education in Management Seminar Entitled "Discrimination, Harassment, and Retaliation Update 2007: Critical Prevention and Response Strategies to Reduce Liability Risks" Manchester, NH |
| November 1, 2006 | *"Shielding Your Organization from Liability in Failing to Make Reasonable Accommodations, Determine Essential Job Functions, and Other Requirements under ADA"* Council on Education in Management Seminar Entitled "Employment Law Update" Manchester, NH |
| October 19, 2006 | *"ADA, Reasonable Accommodation and the Interactive Process"* New Hampshire Adjusters' Association Annual Conference, Program Entitled "Return to Work: ADA, FMLA, and Worker's Compensation" Radisson Hotel at the Center of New Hampshire Manchester, NH |

| | |
|---|---|
| June 23, 2006 | *"Recent Massachusetts and First Circuit Cases on FMLA"*<br>Lorman Education Service Seminar Entitled "Advanced Topics under the Family and Medical Leave Act in Massachusetts<br>Holiday Inn Worcester<br>Worcester, MA |
| June 21, 2006 | *"Employment Law Update: Harassment, Discrimination, ADA, FMLA, and Performance Management"*<br>New Hampshire Association of Broadcasters<br>Marriott Grappone Center<br>Concord, NH |
| June 19, 2006 | *"Legal Update on Workplace Romance and Sexual Harassment"*<br>National Human Resources Association, New Hampshire Affiliate<br>Crowne Plaza Hotel<br>Nashua, NH |
| June 19, 2006 | *"Advanced Employment Law: Working Through Common Problems"*<br>National Business Institute Seminar Entitled "Reducing the Potential for Discrimination and Harassment Liability"<br>Manchester, NH |
| June 14, 2006 | *"Legal Update: Discrimination and Disability Issues"*<br>Granite State Legal Administrators Association<br>McLane Law Firm<br>Manchester, NH |
| May 19, 2006 | *"The Internal Investigation: How It Should Be Conducted"*<br>National Employment Lawyers Association, New England Regional Conference entitled "Succeeding in the New Millennium: Practical Advice for your Plaintiff's Employment Practice"<br>Boston Park Plaza Hotel<br>Boston, MA |
| May 16, 2006 | *"Retaining and Managing Your Most Difficult Employees While Staying in Compliance with the Law"*<br>Council on Education in Management Seminar Entitled "Employment Law Update"<br>Four Points Sheraton Hotel<br>Manchester, NH |

| | |
|---|---|
| April 5, 2006 | *"Disability and Religious Discrimination Legal Update"* New Hampshire Bar Association, Continuing Legal Education Program entitled "5th Annual Labor and Employment Law Update" Grappone Conference Center Concord, NH |
| March 22, 2006 | *"Recent Legal Developments You Can't Afford Not to Know About"* Merrimack Valley Human Resources Association Northern Essex Community College Corporate & Community Education Center North Andover, MA |
| March 10, 2006 | *"The Hallmarks of Legally Defensible Documentation"* National Business Institute seminar entitled "Human Resource Policies that Prevent Lawsuits" Sheraton Hotel Newton, MA |
| February 27, 2006 | *"Creating Comprehensive Employee Handbooks"* National Business Institute seminar entitled "Simple Ways to Prevent Avoidable Human Resource Claims" Radisson Hotel at the Center of New Hampshire Manchester, NH |
| February 13, 2006 | *"Legally Defensible Hiring, Training, and Promotion Practices"* Industrial/Organizational Psychology Course St. Anselm's College, Manchester, NH |
| November 17, 2005 | *"Internal Investigations of Harassment and Other Employee Misconduct"* Northeast Human Resources Association Babson Executive Conference Center Wellesley, MA |
| November 15, 2005 | *"Properly Handling an Employee Complaint in New Hampshire"* Lorman Education Services Sheraton Harborside Portsmouth Hotel Portsmouth, NH |
| September 26, 2005 | *"Workplace Romance and Sexual Harassment Claims"* Boston Genesys 25th Human Capital Management Conference Park Plaza Hotel Boston, MA |

September 14, 2005    *"Legal Update and Hiring/Firing Issues"*
Granite State Legal Administrators Association
Wiggin and Nourie law firm
Manchester, NH

February 1, 2005    *"Employee Handbooks: Drafting and Enforcing Sound Procedures and Policies"*
National Business Institute
Concord, NH

December 8, 2004    *"2004 Legal Update"*
Merrimack Valley Human Resources Association, a Chapter of the Society for Human Resources Management
Guest House Suites
Methuen, MA

October 21, 2004    *"300 Ways to Use Your Law Degree"*
Massachusetts Bar Association
Radisson Hotel
Boston, MA

September 22, 2004    *"Sports and Hazing: A Legal Update"*
Rhode Island Interscholastic League
Radisson Hotel
Warwick, RI

February 9, 2004    *"2003 Legal Update of Massachusetts and Federal Law"*
King & Bishop Network Group
King & Bishop
Waltham, MA

December 10, 2003    *"Conducting Effective Sexual Harassment Investigations"* and *"Effectively Utilizing Experts on Employment Practices in Sexual Harassment Cases"*
New Hampshire Bar Association, Continuing Legal Education Program Entitled "The Law of Sexual Harassment"
Holiday Inn
Concord, NH

November 17, 2003    *"Legal Update: The Impact of New Hampshire Supreme Court Decision Madeja v. MPB Corp. d/b/a Split Ballbearing"*
National Human Resources Association, New Hampshire Affiliate
Crowne Plaza Hotel
Nashua, NH

APP48

| | |
|---|---|
| November & December 2003 | *"Basic Construction Law Course: Employment Law"* <br> Associated Builders and Contractors <br> Health and Safety Council <br> Concord, NH |
| September 24, 2003 | *"Sexual Harassment and How to Conduct Investigations"* <br> Society for Human Resources Management, Merrimack Valley Chapter <br> Merrimack College, Andover, MA |
| November 6, 2002 | *"Significant Employment Issues for Small Businesses"* <br> Women's Business Center <br> Fleet Bank <br> Portsmouth, NH |
| November 5, 2002 | *"Sexual Harassment Basics"* <br> Lorman Education Services <br> The Yard Restaurant <br> Manchester, NH |
| July 23, 2002 | *"Employment Practices"* <br> Lorman Education Services <br> Peabody, MA |
| June 11, 2002 | *"Sexual Harassment: The Law"* <br> Northeast Passenger Transportation Association Human Resource Training Day <br> Portland, ME |
| April 2, 2002 | *"Hey, I Was Only Kidding – Sexual Harassment and Workplace Discrimination"* <br> Business Law class of the Honorable John T. Broderick <br> Tuck School, Dartmouth College, Hanover, NH |
| March & April 2002 | *"Basic Construction Law" Course: Employment Law* <br> Associated Builders and Contractors <br> Cobb Hill Construction, Inc. <br> Concord, NH |
| January 14, 2002 | *"Legal Update – 2001 Employment and Labor Laws"* <br> National Human Resources Association <br> Crowne Plaza Hotel, Nashua, NH |
| December 7, 2001 | *"Harassment Law for Transgendered Workers"* <br> Genderfest: What's Gender Got To Do With It? <br> Plymouth State College, Plymouth, NH |

APP49

| | |
|---|---|
| December 5, 2001 | *"Hot Topics in School Law in New Hampshire – Harassment and Hazing"* <br> Lorman Education Services <br> The Yard, Manchester, NH |
| November 3-4, 2001 | *"How to Write an Employee Handbook"* <br> National Association of Women in Construction <br> The Margate, Laconia, NH |
| November 2, 2001 | *"Defining Sexual Harassment"* <br> Lorman Education Services <br> The Yard, Manchester, NH |
| November 6-7, 2001 | *"The Continuum of Sexual Harassment Workshop"* <br> New Hampshire Sexual Harassment Task Force, Title IX Training <br> Primex³ Offices <br> Concord, NH |
| September 11, 2001 | *"Bullying, Hazing and Harassment"* <br> Sexual Harassment Task Force Train the Trainer Conference <br> Primex³ Offices <br> Concord, NH |
| June 8, 2001 | *"Investigations of Harassment and Other Complaints"* <br> Primex³ Offices <br> Concord, NH |
| May 9–11, 2001 | *"New Hampshire's Bullying Law"* <br> Primex Annual Conference <br> Mt. Washington Hotel, Bretton Woods, NH |
| March 26-27, 2001 | *"Sexual Harassment Prevention"* <br> The New Hampshire Commission on the Status of Women, Sexual Harassment Task Force and NH Department of Education <br> Primex³, Concord, NH |
| March 16, 2001 | *"Sexual Harassment"* and *"Essential for Conducting an Effective Sexual Harassment Investigation"* <br> Seacoast Staff Development Day <br> UNH Department of Education and Seacoast Educational Services <br> University of New Hampshire, Durham, NH |
| January 26, 2001 | *"Dealing with Injured or Disabled Employees"* <br> Glass Forum 2001 <br> The Center of New Hampshire and Holiday Inn, Manchester, NH |

December 8, 2000     *"Hot Topics in School Law in New Hampshire"* --
*Sexual Harassment*
Lorman Education Services
The Yard Restaurant, Manchester, NH

December 6, 2000     *"Essential Policies under State and Federal Law"*
Fleet Series Workshop/Women's Business Center
Sheraton Wayfarer, Bedford, NH

November 8, 2000     *"Sports, Hazing and Harassment"*
Hazing and Unlawful Harassment Seminar
New Hampshire Interscholastic Athletic Association
Concord, NH

September 20, 2000     *"Safeguarding Against Hazing and Other Forms of Unlawful
Harassment Seminar"*
New Hampshire Interscholastic Athletic Association Annual Meeting
Sheraton Wayfarer, Bedford, NH

August 24, 2000     *"Deductions from Salary"* and *"Independent Contractors vs. Employees"*
Lorman Education Services
The Event Center at C.R. Sparks, Bedford, NH

August 23, 2000     *"Sports and Hazing"*
Rhode Island Interscholastic League
Rhode Island College, Providence, RI

June 29, 2000     *"Sexual Harassment: An Attorney's Perspective"*
New Hampshire Association of School Principals
Eagle Mountain House, Jackson, NH

May 11, 2000     *"Independent Contractors"*
*"Sexual Harassment"*
EnviroExpo
Hynes Convention Center, Boston, MA

April 19, 2000     *"Privacy in the Workplace"*
Nashua Chamber of Commerce Small Business Institute
Rivier College, Nashua, NH

April 12, 2000     *"Employment Issues in the Workplace"*
Business Law class taught by the Honorable John T. Broderick
Tuck School, Dartmouth College, Hanover, NH

March 16, 2000      *"Hot Issues in Human Resources: How to Hire,*
*Terminate & Protect Your Business"*
The Fleet Series: Hot Issues in Human Resources
Women's Business Center, Manchester, NH

APP52

| | |
|---|---|
| February 2, 2000 | *"Essential Employment Policies under New Hampshire Law"*<br>Women's Business Center, Peer Advisory Meeting<br>Fleet Bank, Portsmouth, NH |
| January 21, 2000 | *"The Legal and Ethical Implications of Ex-Parte Communications"*<br>New Hampshire Bar Association,<br>Continuing Legal Education program<br>Wayfarer Inn, Bedford, NH |
| January 10, 2000 | *"Legal Update: The Impact of Recent Changes in the Law"*<br>National Human Resources Association, New Hampshire Affiliate<br>CR Sparks, Bedford, NH |
| November 17-18, 1999 | *"Controlling Drugs and Alcohol Abuse in the Workplace,"*<br>*The Fundamentals of EEOC Compliance: How to Avoid Discrimination Claims,"*<br>*"Employee Privacy in Today's Workplace: Balancing Your Employees' Rights with Your Information Needs"*<br>Council on Education in Management seminar entitled<br>"The Basics of Employment Law"<br>Highlander Inn, Manchester, NH |
| October & November 1999 | *"Basic Construction Law" Course: Employment Law*<br>Associated Builders and Contractors<br>Cobb Hill Construction<br>Concord, NH |
| October 28, 1999 | *"Update on Employment Law"*<br>Batchelder Chapter of the American Inns of Court<br>Centennial Inn, Concord, NH |
| October 20, 1999 | *"Hiring and Managing Employees Defensively"*<br>Women in Technology International<br>Daniel Webster College, Nashua, NH |
| October 20, 1999 | *"Creating a Safe and Productive Workplace that Complies with New OSHA Standards"*<br>Council on Education in Management seminar entitled<br>"Workers' Compensation Update"<br>Highlander Inn, Manchester, NH |
| October 13, 1999 | *"Handbooks and Employment Law"*<br>National Association of Women in Construction,<br>Granite State Chapter #218<br>Intervale Country Club, Manchester, NH |

APP53

| | |
|---|---|
| October 6, 1999 | *"Human Resources Management for Law Firms"*<br>Moderator, Chair<br>New Hampshire Bar Association,<br>Continuing Legal Education program<br>CR Sparks, Bedford, NH |
| September 28, 1999 | *"Creating Effective Documentation"*<br>Council on Education in Management seminar entitled<br>"Personnel Law Update"<br>The Highlander Inn, Manchester, NH |
| June 25, 1999 | *"Workplace Violence: Safety & Security for Lawyers"*<br>Moderator<br>New Hampshire Bar Association,<br>Continuing Legal Education program<br>The Balsams, Dixville Notch, NH |
| May 12, 1999 | *"Creating Effective Handouts"*<br>American Society for Training and Development<br>Marriott Courtyard, Portsmouth, NH |
| April 15, 1999 | *"Discovery and an Employer's Sexual Harassment Policies,<br>Internal Investigations, and Training Materials"*<br>New Hampshire Bar Association,<br>Continuing Legal Education program<br>"Discovery Issues in Employment Law Cases"<br>CR Sparks, Bedford, NH |
| February 10, 1999 | *"An Introduction to Employment Law Issues"*<br>The 8th Annual Conference on "Horses & Healing"<br>Pony Farm, Temple, NH |
| January 15, 1999 | *"Preventing Sexual Harassment in the Workplace" and<br>"Controlling Drugs and Alcohol in the Workplace"*<br>Council on Education in Management seminar entitled<br>"The Basics of Employment Law"<br>The Highlander Inn, Manchester, NH |
| October &<br>November 1998 | *"Basic Construction Law" Course: Employment Law*<br>Associated Builders and Contractors<br>Cobb Hill Construction<br>Concord, NH |

June 30, 1998     *"One Sexual Harassment Suit Can Sabotage Your Business.*
*Learn How to Cope Before It Happens"*
Sadler Insurance Agency and Employment Practices Group
Nashua Country Club, Nashua, NH

June 23, 1998     *"One Sexual Harassment Suit Can Sabotage Your Business.*
*Learn How to Cope Before It Happens"*
Sadler Insurance Agency and Employment Practices Group
Manchester Country Club, Manchester, NH